

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WAUSAU UNDERWRITERS INSURANCE
COMPANY,

    Plaintiff,

v.

UNITED PLASTICS GROUP, INC.,

    Defendant.

THE OHIO CASUALTY INSURANCE COMPANY,

    Intervenor/Plaintiff,

v.

UNITED PLASTICS GROUP, INC.,

    Defendant.

MICROTHERM, INC.,

    Intervenor/Plaintiff

v.

THE OHIO CASUALTY INSURANCE COMPANY,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 04 C 6543

Judge John W. Darrah

## OPINION AND ORDER

Plaintiff, Wausau Underwriters Insurance Company, filed a declaratory judgment action against Defendant, United Plastics Group, Inc. ("UPG"), regarding an insurance coverage issue arising from a lawsuit and jury trial verdict in a Texas state court. The Ohio Casualty Insurance

1

Company was granted leave to intervene in this action, seeking a declaration that it owes no coverage to UPG for the claims asserted by Wausau. Microtherm, as a judgment creditor and as the assignee of the rights to indemnity under certain excess insurance policies, was also granted leave to intervene.[1] Trial of these declaratory actions was by this Court without a jury. The Court considered testimony of the two witnesses and exhibits, including the transcript of the underlying Texas jury trial. Prior to this trial, Ohio Casualty filed a Motion *in Limine* to exclude any additional evidence, other than the Final Judgment of the underlying case, and a motion to amend its pleadings. Both motions were taken under advisement.

## MOTION *IN LIMINE*

Ohio Casualty, here, seeks to exclude all evidence other than the Final Judgment in the underlying Texas lawsuit. Ohio Casualty contends that the jury's findings, which are incorporated into the Final Judgment, are the only relevant evidence to be considered in the declaratory judgment action because those findings, alone, determine whether coverage exists.

The Texas lawsuit alleged breach of contract, breach of duty of good faith and fair dealing, fraud and misrepresentation, breach of warranty, negligence, and deceptive trade practices in violation of the Texas Deceptive Trade Practices Act. In 2004, following a six-week jury trial, the Texas court returned a verdict in Microtherm's favor in the amount of approximately $70 million in total damages and entered judgment against UPG in February 2005. UPG assigned its rights to indemnity under the Ohio Casualty policies to Microtherm, as mentioned above.

---

[1] Two other insurance companies, Federal Insurance Company and Travelers Property and Casualty Company of America, also intervened in the action. Both of these intervenors and Wausau have been dismissed pursuant to settlement.

Ohio Casualty has denied indemnification, contending that Microtherm's damages were not caused by an "occurrence" and/or there was no "property damage" as defined in the Ohio Casualty policies. Microtherm and UPG argue that they are not attempting to avoid the Microtherm jury findings or to collaterally attack the judgment in the Microtherm lawsuit. Instead, Microtherm and UPG seek to offer evidence here that there was "property damage" as defined in the insurance policies – an issue, it contends, that was neither tried by or submitted to the Texas jury.

A duty to indemnify exists if the insured's activity and resulting damage or loss *actually* fall within a policy's coverage. *See Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 128 (1992). (Emphasis in original).[2] The underlying trial and verdict may be determinative as to the duty to indemnify. *See International Ins. Co. v. Rollprint Packaging Prod., Inc.*, 312 Ill. App. 3d 998, 1013 (2000). However, issues germane only to coverage, and not liability, may be present that would not have been litigated in the underlying case, requiring additional testimony in the indemnification action. *See Pekin Ins. Co. v. Pulte Home Corp.*, 344 Ill. App. 3d 64, 71 (2003) (trial court judgment in underlying case, while relevant, was not controlling in coverage analysis because issues germane to coverage were not litigated in the underlying trial); *CSX Transp., Inc. v. Chicago & North Western Transp. Co.*, No. 93-C-0168, 1994 WL 406546 at * 6 (N.D. Ill. Aug. 1, 1994) ("this is not to say that when a civil jury reaches a verdict we are bound by the terms employed in the jury instructions when we address whether the underlying litigation is covered under an indemnification agreement"). *See also Affiliated FM Ins. Co. v. Beatrice Foods Co.*, 645 F. Supp. 298, 302 (N.D. Ill. 1985) (state court finding that a swimming pool coating manufacturer

---

[2] The parties agree that Illinois law controls the declaratory judgment actions filed in this Court. *See* Rest. 2d Conf. § 188; *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill. 2d 520, 526-27 (1995).

intentionally misrepresented qualities of pool coating to pool retailer and that damage to manufacturer's marketing division were foreseeable results of defects in products did not preclude issue of whether manufacturer either "intended or expected" damages to swimming pool retailer); *Metropolitan Prop. & Cas. Ins. Co. v. Pittington*, 362 Ill. App. 3d 220, 225 (2005) (*Pittington*) (court went beyond insured's guilty plea to reckless conduct in determining whether the insured expected or intended the harm in finding that factual issue existed as to this issue relevant to indemnification).

Here, Microtherm and UPG seek to admit evidence to prove that there was "property damage" as defined in the Ohio Casualty insurance policies. This issue was not submitted to, nor considered by, the jury in the Texas lawsuit because the Ohio Casualty policy's definition of "property damage" (as set out below) was not relevant to Microtherm's right of recovery in the Texas lawsuit. Accordingly, evidence on this issue is here admissible.

In the alternative, Ohio Casualty argues that Microtherm is collaterally estopped from relitigating the Microtherm lawsuit. Microtherm and UPG contend that they are not seeking to relitigate the Microtherm lawsuit and that collateral estoppel does not apply.

Collateral estoppel prevents the relitigation of issues if: (1) the issue in the first action is identical to the one presented in the declaratory judgment action, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted must have been a party or in privity with a party in the prior adjudication. *See American Family Mut. Ins. Co. v. Savickas*, 193 Ill. 2d 367, 387 (2000). If the coverage issue and the issue in the underlying suit are not identical, collateral estoppel is not applicable. *See Pittington*, 362 Ill. App. 3d at 227; *Allianz Ins. Co. v. Guidant Corp.* , 355 Ill. App. 3d 721, 735 (2005); *Cowan v. Insurance Co. of North America*, 22 Ill. App. 3d 883, 887 (1974). As discussed above, the issues pertaining to

4

coverage, such as whether there was "property damage" as defined in the Ohio Casualty insurance policy, are different than the issues in the Texas lawsuit. Accordingly, the doctrine of collateral estoppel does not apply.

Based on the above, Ohio Casualty's Motion *in Limine* to Exclude Additional Evidence or Testimony is denied.

## MOTION FOR LEAVE TO AMEND PLEADINGS

Two days before trial was set to commence, Ohio Casualty moved to amend its pleadings to "correct" the record to reflect that Ohio Casualty insured UPG under only one insurance policy, instead of two as previously pled. Ohio Casualty claims that until this time, it had mistakenly believed that there were two applicable policies. However, a few days before trial, it determined that the 2002-2003 policy premium had not been paid by UPG and that the policy was "cancelled flat"[3] per UPG's request. Prior to this time, Ohio Casualty had pled, affirmatively stated, and testified that UPG was insured under two umbrella policies for the years 2001-2002 – for coverage of September 27, 2001 to September 27, 2002 – and for years 2002-2003 – for coverage of September 27, 2002 to September 27, 2003. These affirmations appeared in Ohio Casualty's: (1) reservation-of-rights letter sent to UPG during the course of the Texas litigation, (2) Complaint in Intervention, (3) Proposed Findings of Fact, (4) acceptance of Microtherm's and UPG's Findings of Fact that both policies were at issue, (4) acceptance of Microtherm's and UPG's Proposed

---

[3]On the expiration of the 2001-2002 policy, Ohio Casualty renewed UPG's coverage and issued a second commercial umbrella policy to UPG for the period of September 27, 2002 to September 27, 2003. Ohio Casualty billed UPG's broker but never received the premium for the second policy. Subsequently, the billing department learned that the second policy had been "cancelled flat" (cancelled as of the date of its inception) by UPG by declining coverage and not paying the premium.

Findings of Fact that the premiums for both policies had been timely paid, (5) acceptance of Microtherm's and UPG's Proposed Findings of Fact that neither policy had been cancelled, and (6) an Assistant Vice President's denial under oath that Ohio Casualty was contending that premiums had not been paid or that the policies were cancelled.

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). However, leave to amend is not automatic and may be denied at the court's discretion for reasons such as undue delay, the movant's bad faith, and undue prejudice to the opposing party. *See Forman v. Davis*, 371 U.S. 178, 182 (1962).

Microtherm and UPG argue that they will be severely prejudiced by the late change in the number of policies in effect because Microtherm relied upon Ohio Casualty's representation that two policies existed when Microtherm settled with other insurance carriers before this trial. UPG argues it could now face a claim that the entire settlement should be set aside based on this misrepresentation, thereby exposing UPG to a financially ruinous judgment.

Microtherm and UPG also argue that Ohio Casualty should be barred from changing its previous position that two policies existed pursuant to the "mend the hold" doctrine, which provides that when a party initially asserts a specific reason or reasons for being freed from its contractual obligations, it cannot advance any different or additional reasons later in the litigation. *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363-64 (7th Cir. 1990) (insurance company changed reason for denial of coverage 180 degrees in same litigation); *Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 846 F. Supp. 677, 685 (N.D. Ill. 1994) (insurance company

attempted to add defense that insured did not give notice as soon as practicable). Here, Ohio Casualty is not attempting to add a new reason to deny coverage but is arguing that one policy was never in effect, *i.e.,* does not exist.

Microtherm and UPG may be prejudiced if the amendment is allowed and Ohio Casualty is permitted to plead only one policy was in effect. However, Illinois law prohibits the creation of coverage that did not exist. *See Nationwide Mutual Ins. Co. v. Filos*, 285 Ill. App. 3d 528, 534 (1996) (*Nationwide*); *Bourne v. Seal*, 53 Ill. App. 2d 155, 170 (1964); *Great West Casualty Co. v. Rogers Cartage Co.*, 00 C 6221, 2001 WL 1607608 (N.D. Ill. Dec. 12, 2001). The rationale for this rule is that an insurance company should not be required to pay for a loss for which it has not charged or received a premium. *See Nationwide*, 285 Ill. App. 3d 534. There are two exceptions to this general rule: (1) where the insurer misrepresents the extent of coverage and induces the insured to purchase coverage which does not in fact exist and (2) where the insurer defends an action on behalf of the insured with knowledge of facts that would provide a defense to coverage but without a reservation of rights. *See Nationwide*, 285 Ill. App. 3d 534. Neither of these exceptions apply here.

Here, coverage under the policy ending September 27, 2003, did not exist because UPG did not pay the premium and the policy never took effect per UPG's direction. Coverage under this policy cannot be created by Ohio Casualty's (and UPG's) mistakes.

Based on the above, Ohio Casualty's Motion for Leave to Amend is granted.

## BENCH TRIAL ON THE DECLARATORY ACTION

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following Findings of Fact and Conclusions of Law based upon consideration of all admissible evidence and the Court's own assessment of the credibility of the witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact.

### Findings of Fact

Ohio Casualty issued a commercial umbrella excess-liability policy, policy number BXO (02) 52 88 24 03, to UPG, which was in effect for the period of September 27, 2001 to September 27, 2002. The policy contains a limit of $25 million in excess of the underlying policies issued by Wausau Underwriters Insurance Company.

The policy provides, in pertinent part, that Ohio Casualty:

> will pay on behalf of the "Insured" those sums in excess of the "retained Limit" that the "insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "insured" under an "insured contract" because of "bodily injury," "property damage," "personal injury," or "advertising injury" that takes place during the Policy period and is caused by an "occurrence" happening anywhere.

An "occurrence" with respect to property damage is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is defined, in relevant part, as: "Physical injury to tangible property, including all resulting loss of use of that property . . . or . . . Loss of use of tangible property that is not physically injured."

The policy also provides for "products-completed operation hazard," which is defined as "all . . . 'property damage' from an 'occurrence' taking place away from premises you own or rent and arising out of 'your product' or 'your work' except" products still in the insured's physical possession or which have not yet been completed or abandoned.

"Your product" is defined as "any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . you."

"Your work" is defined as: "(1) work or operations performed by you or on your behalf; and (2) materials, parts or equipment furnished in connection with such work or operations."

"Your product" and "your work" both include: "(1) warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product' [and 'your work']; and (2) the providing of or failure to provide warnings or instructions."

The policy excludes coverage to:

> A. "Bodily injury" or "property damage" expected or intended from the standpoint of the "Insured."
> * * *
> E. "Property damage to "impaired property" or property that has not been physically injured, arising out of:
>
> 1. a defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or
>
> 2. a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

9

"Impaired property" is defined as:

>  tangible property, other than "your product" or "your work," that cannot be used or is less useful because:
>
>  1. it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
>  2. you have failed to fulfill the terms of a contract or agreement;
>
>  If such property can be restored to use by:
>
>  1. the repair, replacement, adjustment or removal of "your product" or "your work"; or
>
>  2. your fulfilling the terms of the contract or agreement.

The policy excludes coverage to "'property damage' to 'your product' arising out of it, or any part of it" and "'property damage' to 'your work' arising out of it or any part of it and included in the 'product-completed operations hazard'".

Coverage is also excluded under "Exclusion H" for damages for any loss, cost or expense incurred by the insured or others because of the withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of the insured's product, work, or impaired property.

Microtherm manufactures and sells electronically controlled tankless water heaters under the name "Seisco." UPG was one of the companies that manufactured molded plastic chambers for use in the Seisco water heaters. UPG originally started molding Microtherm's chambers at its Gladewater plant. In February 2002, UPG shut down the Gladewater plant; and the Microtherm mold was then manufactured at UPG's Houston plant. Prior to UPG's manufacturing the chambers, UPG was aware that the chambers were to be used in the Seisco hot-water heaters. UPG was also

aware of problems and concerns Microtherm had with the previous manufacturer, Puget Plastics, including using too low of a "melt temperature" in manufacturing the plastic chambers.

The chambers were molded from a DuPont nylon resin called Zytel. DuPont recommended the "melt temperature" for Zytel is 540 to 580 degrees Fahrenheit. Leeroy Dangel, UPG's process engineer at the UPG Gladewater plant, knew of the recommended melt temperature range for Zytel. Dangel used melt temperatures 70 to 100 degrees lower than DuPont's recommended melt temperatures. Dangel was concerned about making the chambers at too low of a temperature but used the lower temperature because David Seitz, President of Microtherm, was adamant about "no burns" and "no flash," visual defects in the chambers. In February 2002, Seitz realized that UPG was using the same low temperatures that Puget had been using and became concerned. In early 2002, the UPG-manufactured water chambers began failing, causing the Seisco water heaters to malfunction.

The underlying suit was filed by Microtherm in 2002 in the 357th Judicial District Court of Cameron County, Texas, against UPG and others, regarding the failures of the Seisco water heaters. Microtherm's Seventh-Amended Petition alleged that UPG: (1) breached its contract with Microtherm by selling inferior and/or defective parts, (2) breached its duty of good faith, (3) engaged in fraud and misrepresentation in making statements that they knew or should have known were false for the purpose of inducing Microtherm to act or refrain from acting, (4) breached express/implied warranties by selling inferior/defective parts, (5) was negligent in its actions as related to the manufacturing, and (6) engaged in deceptive trade practices. The Petition alleged that UPG's conduct resulted in damage and injury to their products, work or services, the water heater itself, Microtherm's product, and customers' property. Damages sought included lost profits (past and

11

future), increased warranty claims and overhead costs, costs of repairs and replacements, lost sales, damages for cover, the value of wasted materials and damaged parts, increased insurance rates due to loss experience, lost royalties, loss of good will, cost and expense of recalls, loss of reputation/goodwill, attorney's fees, and loss of business opportunity. Microtherm also sought exemplary damages, alleging that UPG's conduct was intentional, willful and committed knowingly in conscious disregard of Microtherm's rights, welfare, and safety.

Trial commenced on November 8, 2004; and a jury returned a verdict in favor of Microtherm and against UPG on December 17, 2004. On February 7, 2005, final judgment was entered. The final judgment included the answers to numerous questions that had been presented to the jury.

The Texas jury in the underlying suit found that UPG engaged in "false, misleading or deceptive act[s] or practice[s] that Microtherm relied to its detriment and that [were] a producing cause of damages." These acts or practices included: (1) representing that goods or services had or would have characteristics that they did not have, (2) representing that goods or services were of a particular quality if they were of another, and (3) failing to disclose information about goods or services that was known at the time of the transaction with the intention to induce Microtherm into a transaction that it would not have entered had the information been disclosed.. The jury also found that UPG engaged in a "unconscionable action or course of action that was a producing cause of damages to Microtherm." Unconscionable action or course of action was defined as "an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

The jury found that UPG failed to comply with a warranty by furnishing or selecting goods that were not suitable for a particular purpose and failing to perform services in a good and

12

workmanlike manner. The jury awarded Microtherm the following amounts to compensate Microtherm for its damages that resulted from UPG's false, misleading or deceptive acts or practices, unconscionable actions, and breach of warranty: $100,000 - reasonable and necessary cost to repair and/or replace parts provided or work performed by UPG; $5,500,000 - lost past profits; $350,000 - lost future profits; $11,500,000 - damage to the value of Microtherm.

The jury found that UPG acted "knowingly" with respect to all of the above conduct. "Knowingly" was defined as "actual awareness at the time of the conduct of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." Microtherm was awarded an additional $600,000 because UPG's conduct was committed knowingly.

The jury found that UPG made a negligent misrepresentation on which Microtherm justifiedly relied. No damages were awarded to Microtherm for the negligent misrepresentation.

The jury found that UPG engaged in fraud against Microtherm. The jury awarded Microtherm the following amounts to compensate Microtherm for its damages resulting from the fraud: $1,000,000 - reasonable and necessary cost to repair and/or replace the parts provided or work performed; $800,000 - lost past profits; $350,000 - lost future profits; and $700,000 - damage to the value of Microtherm. The jury further found, by clear and convincing evidence, that the harm to Microtherm resulted from UPG's fraud. The jury awarded Microtherm $330,000 in exemplary damages for the fraud committed by UPG.

Evidence introduced at the bench trial before this Court, including the testimony of Seitz, established the following facts. UPG molded the plastic chambers that were placed in the Seisco

13

units between November 2000 and December 2001, and over 600 of UPG's chambers had failed. In April 2002, Microtherm became aware of a significant number of UPG chamber failures. The UPG chamber failures caused a short in the circuit board of the water heater because of water leaking and spraying onto the circuit board. Once the circuit board (which was not manufactured by UPG) shorted out, the water heater was rendered useless. The UPG chamber leaks also caused damage to customers' homes, including ceilings caving in and damage to floors, carpeting, furniture and other personal property.

Owners of Seisco units that were frustrated and dissatisfied because of water damage, damaged parts, and the inability to use their hot-water heaters complained to the sellers. As a result of the failures and user complaints, the distributors lost confidence in Microtherm and stopped selling and carrying the Seisco heaters. The drop in sales resulted in lost profits and loss of value of Microtherm in terms of goodwill and reputation. In early 2000, DuPont had valued Microtherm at $80 million; and after the water failures, Microtherm was valued at under $5 million.

### Conclusions of Law

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and venue is proper pursuant to 28 U.S.C. § 1391.

When construing the language of an insurance policy, a court ascertains and gives effect to the intention of the parties as expressed in their agreement. *State Farm Mutual Auto. Ins. Co. v. Villicana*, 181 Ill. 2d 436, 442 (1998) (*Villicana*). Terms in the policy are accorded their plain and ordinary meaning and are applied as written unless such application contravenes public policy. *See Villicana*, 181 Ill. 2d at 442. The policy must be read as a whole; and the court must consider the

14

type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *See Villicana*, 181 Ill. 2d at 442. Limitations and exclusions are construed liberally in favor of the insured and against the insurer. *See Villicana*, 181 Ill. 2d at 442.

The insured bears the burden of proving that its claim falls within the insuring agreement of the insurance policy.[4] If the insured meets this burden, the insurer must prove that the claim falls within an exclusion if it wishes to decline coverage. *See St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 146 Ill. App. 3d 107, 109 (1986).

The Ohio Casualty policy is "intended to provide coverage for injury or damage to the person or property of others . . . ." *Pekin Ins. Co. v. Richard Marker Assoc., Inc.*, 289 Ill. App. 3d 819, 822 (1997) (*Pekin*). Coverage may include consequential damages suffered as a result of property damage. *See American Home Assurance Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 26 (1st Cir. 1986) (*American Home*); *Hartford Accident & Indemnity Co. v. Crider*, 392 F. Supp. 162, 172 (N.D. Ill. 1974) (*Crider*); *Hartford Accident & Indemnity Co. v. Case Foundation Co.*, 10 Ill. App. 3d 115, 123-24 (1973). Inclusion of the term "because of property damage" is reasonably construed to mean all liability arising from property damage. If an insurance company wishes to exclude consequential damages, it must use specific language doing so. *See American Home*, 786 F.2d at 26.

---

[4]UPG and Microtherm do not seek any award as to the fraud findings; accordingly, recovery for these damages is not addressed.

## OPINION

### Was There Property Damage?

Microtherm has demonstrated that there was physical injury to tangible property and the loss of use of tangible property – the Seisco units and damage to third parties' homes and business premises and personal property within these buildings.

### Was There an Occurrence?

Comprehensive general liability policies "are intended to provide coverage for injury or damage to the person or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." *Pekin*, 289 Ill. App. 3d at 822.

As set out above, the Ohio Casualty insurance policy defines an "occurrence," for purposes of property damage, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "An accident" is defined by Illinois law as "an unforeseen occurrence, usually of an untoward or disastrous character, or an undesigned sudden or unexpected event of an inflictive or unfortunate character." *Massachusetts Bay Ins. Co. v. Vic Koening Leasing Co.*, 136 F.3d 116, 1124 (7th Cir. 1998 ) (citation omitted). Natural and ordinary consequences of an act do not constitute an "accident." *See Aetna Cas. & Sur. Co. v. Freyer*, 84 Ill. App. 3d 617, 619 (1980) (*Freyer*). The property damage, as unexpected nor intended, is considered from the viewpoint of the insured in determining whether an accident has occurred. *See United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 77-78 (1991) (*Wilkin*). Intentional acts may be covered under an insurance policy if the acts cause unexpected or unintended results. *See Country Mut. Ins. Co. v. Hagan*, 298 Ill. App. 3d 495, 508 (1998). However, even if property damage is not

16

intended, it may be expected and be excluded from coverage. Property damage is expected if it should have been reasonably anticipated by the insured. For example, in *American Fire & Cas. Co. v. Broeren Russo Const., Inc.*, 54 F. Supp. 2d 842 (C. D. Ill. 1999) (*American Fire*), there was no policy "occurrence" based on a claim that the defendant was hired to furnish, install, and deliver a water system to prevent water from leaking into the interior of the building when the water system did not function properly and walls and ceilings were damaged. The court found it "inconceivable" that the defendant would not have foreseen damage from water leaking into the building as a possible result of the failure of the water system to prevent such leaking. *American Fire*, 54 F. Supp. at 848-49; *see also, Freyer*, 89 Ill. App. 3d at 619-20 (injury caused by assault and battery usually not considered to be accidental); *Calvert Ins. Co. v. Western Ins. Co.*, 874 F.2d 396, 399 (7th Cir. 1989) (*Calvert*) (police officers that repeatedly hit plaintiff in the face and head with their fists and nightsticks should have reasonably anticipated that plaintiff would be injured by such acts). Accordingly, the natural and ordinary consequences of negligent and unworkmanlike construction of the product or work of the insured do not necessarily constitute an accident merely because property damage can be reasonably expected if one manufactures or works in a negligent or unworkmanlike manner. *See State Farm Fire & Cas. Co. v. Tillerson*, 334 Ill. App. 3d 404, 409 (2002); *American Fire*, 54 F. Supp. 2d at 847; *Diamond State Ins. Co. v. Chester-Jensen Co.*, 243 Ill. App. 3d 471, 435 (1993).

Because it is the *property damage* that must be intended or expected, defects in an insured's product which cause damage to another's property or work product have been found to be unexpected and may constitute an occurrence or accident. *See Ohio Cas. Ins. Co. v. Bazzi Const. Co.*, 815 F.2d 1146, 1148-49 (7th Cir. 1987) (*Bazzi*). In *Wilkin*, the Illinois Supreme Court held that

17

the insured's installation of asbestos insulation in a building, which resulted in the contamination of the building and its contents with asbestos fibers was an occurrence because it was the installation of the product which directly damaged the building and its contents. The resulting damage was not the result of the asbestos's failure to perform its contractual function as an insulator but the damage was caused by an ancillary and coincidental phenomenon of the diffusion of the asbestos's harmful fibers. *Wilkin*, 144 Ill. 2d at 75-78; *see also Pekin*, 289 Ill. App. 3d at 823 (insurer had a duty to defend the insured where allegations included damage to furniture, clothing and antiques, in addition to damage to building itself); *Federated Mut. Ins. Co. v. Grapevine Excavation*, 197 F.3d 720, 725 (5th Cir. 1999) (duty to defend subcontractor in suit by general contractor for damage to another subcontractor's work). In *Bazzi*, the Seventh Circuit found that the insurer had a duty under the policy to the insured construction company based on defects in the construction company's work and products that caused damage not only to the construction company's own work or product but also to the existing parking garage where the work was performed. The definition of "occurrence" in the *Bazzi* insurance policy is strikingly similar to the definition of "occurrence" in the instant case. "Occurrence" was defined in the *Bazzi* insurance policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Bazzi*, 815 F.2d at 1147. As set out above, "occurrence" is defined in the instant policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Moreover, contrary to *Bazzi*, the phrase "property damage expected or intended from the standpoint of the 'insured'" appears in an exclusion. Ohio Casualty, therefore, has the burden of proof on this issue.

18

In a related argument, Ohio Casualty contends that UPG's "knowing" misconduct (as found by the jury in the underlying suit) prevents a finding that the property damage was an unforeseen occurrence or an unexpected event. Ohio Casualty contends that because UPG knowingly manufactured a plastic chamber that was not suitable for holding water, UPG should have expected, or it was foreseen, that the water would leak from the chamber. However, as explained above, it is not the leaking of water that must be expected or foreseen; it is the resulting property damage that must be expected or foreseen. *See Wilkin*, 144 Ill. 2d at 77-78. Here, the resulting property damage was the damage to the circuit boards within the heaters and to the personal property in the Seisco users' homes and businesses. The jury's finding that UPG knowingly manufactured a plastic chamber that was not suitable for its purpose does not establish that this damage was foreseen or an expected result as defined in the policy. *See Calvert*, 874 F.2d at 399 ("Even an intentional act will be covered . . . if it causes an unexpected and unintended result."). Ohio Casualty refers to *American Fire* in support of this argument. As discussed above, the *American Fire* defendant specifically contracted to furnish, install and deliver a system to *prevent* water from leaking into the building. The natural result of the negligent failure to do so, resulting water damage to the interior of the building, cannot be said to be unforeseen. *See Calvert*, 874 F.2d at 399 (some injuries are reasonably anticipated, *i.e.*, injury reasonably anticipated when police officers repeatedly hit plaintiff in face and head with their fists and nightsticks).

It should be noted that *American Fire* did not address products-completed operations coverage, such as in effect here, which expressly covers breaches of warranty and misrepresentations regarding the product. And neither of the cases relied upon by the *American Fire* court, *Monticello Ins. Co. v. Wil-Freds Constr., Inc.*, 227 Ill. App. 3d 697 (1996), and *Indiana Ins. Co. v. Hydra Corp.*,

19

245 Ill. App. 3d 926 (1993), involved damage to a third party such as Microtherm, here. Significantly, the *Monticello* court specifically noted that had damage to a third party been claimed because of the faulty workmanship, there would be "little doubt" that there was an occurrence. *See Monticello*, 277 Ill. App. 3d at 705.

Also, certain policy provisions addressing the issue, when considered together, belie Ohio Casualty's argument. UPG's "knowing" conduct, as a basis for its claim, does not defeat coverage under the terms of the policy; only property damage that is "expected or intended from the standpoint of the insured" is mentioned in exclusion A. Knowing conduct is not included; to read knowing conduct into the exclusion would render other exclusions, such as Exclusion J of the Ohio Casualty policy, as surplusage. Exclusion J of the Ohio Casualty policy specifically excludes communications made with "knowledge" of its falsity and "knowing" violations of other rights. But this exclusion applies only to "personal injury" and "advertising injury." It expressly does not apply to "property damage," as claimed here. An insurance policy is construed in a manner as to not render any portion thereof as mere surplusage. *See Welborn v. Illinois. Nat. Cas. Co.*, 347 Ill. App. 65, 68 (1952). The purpose of an exclusion is to remove coverage for something that would otherwise be covered by the insurance policy. *See American States Ins. Co. v. Koloms*, 177 Ill. 2d 473, 492-93 (1997). In other words, if certain damage is not covered by the insurance policy, there would be no reason to specifically exclude it elsewhere in the policy. Moreover, if knowing conduct that resulted in "personal injury" or "advertising injury" was intended to be included in the definition of "occurrence," as contended by Ohio Casualty, it would not be necessary to specifically exclude knowing conduct in Exclusion J.

Microtherm and UPG have proven that defects in UPG's product caused damage to another's property and that the resulting damage was not intended or expected or foreseen. Accordingly, the resulting property damage was an occurrence under the Ohio Casualty policy. Ohio Casualty has failed to show that the loss was excluded from coverage under the terms of the policy, as more fully discussed below.

### Are the Liability Findings Covered Under the Policy?

Pursuant to the Ohio Casualty policy, Ohio Casualty agreed to pay all "sums in excess of the 'Retained Limit'" that UPG became "legally obligated to pay . . . because of . . . 'property damage' . . . that takes place during the Policy period and is caused by an 'occurrence' happening anywhere in the world." UPG and Microtherm have demonstrated that there was "property damage," including physical injury to property and the loss of use of property that had not been physically injured within the policy period. The property damage was caused by an "occurrence" as defined in the Ohio Casualty policy. Furthermore, Microtherm's economic losses were "because of property damage" and are covered under the Ohio Casualty insurance policy. *See Riley Stoker Corp. v. Fidelity & Guaranty Ins. Underwriters, Inc.*, 26 F.3d 581, 588 (5th Cir. 1994); *American Home*, 786 F.2d at 26; *Crider*, 392 F. Supp. at 171 (consequential damages may be recoverable where they flow from damage to tangible property).

The jury in the underlying suit also found that UPG engaged in misrepresentations and failed to comply with a warranty. The Ohio Casualty policy provides coverage for products-completed operations hazards. Products-completed operations hazard is defined in the policy as "all . . . 'property damage' from an 'occurrence' taking place away from premises you own or rent and arising out of 'your product' or your work' . . . ." "Your Product" and "Your Product" specifically

21

include 'warranties and representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product' or 'your work.'" Thus, breach of warranties and misrepresentations are covered events under the Ohio Casualty policy.

## Damages

The UPG-molded water chambers began failing to a significant degree by early 2002. These chambers had been manufactured by UPG at the Gladewater plant. The initial failures were the "kiss of death" because Microtherm customers were under the impression that the problems Microtherm had experienced with Puget had been corrected. As a result of the new failures and customer complaints, Microtherm's customers ceased using Microtherm's products. The loss of customers and distributors resulting from the failures of the UPG-molded chambers formed a significant portion of Microtherm's lost profits. The failures also resulted in significant damage to the value of Microtherm. As noted above, in early 2000, DuPont had valued Microtherm at $80 million. Subsequent to the chamber failures, Microtherm was valued at approximately $5 million.

## Is Coverage Excluded?

Ohio Casualty argues that multiple exclusions are applicable – including Exclusion A, Exclusion E, Exclusion F, Exclusion G, and Exclusion H. Ohio Casualty bears the burden of proof that an exclusion applies, and application of the exclusion must be clear and free from doubt. *See Connecticut Specialty Ins. Co v. Loop Paper Recycling, Inc.*, 356 Ill. App. 3d 67, 72 (2005); *Continental Casualty Co. v. McDowell & Colantoni, Ltd.*, 282 Ill. App. 3d 236, 241 (1996). Furthermore, for an exclusion to be properly raised before the court, the insurance company must

do more than merely cite to the exclusion. The insurance company must explain why the provision is applicable to the case before the court and how the provision operates to exclude the disputed claim. *See Bazzi*, 815 F.2d at 1149.

### Exclusion A

Exclusion A of the Ohio Casualty insurance policy excludes coverage for property damage that is expected from the standpoint of UPG, the insured. Such exclusions have been added to make clear the limitation that coverage is excluded for intentional or expected injuries caused by the insured. *See Freyer*, 89 Ill. App. 3d at 619-20. As discussed above, Ohio Casualty has not demonstrated that UPG expected the resulting property damage. Accordingly, coverage is not excluded under Exclusion A of the Ohio Casualty policy.

### Exclusion E

Exclusion E of the Ohio Casualty policy also excludes coverage for "impaired property" or "property that has not been physically injured." Ohio Casualty has failed to demonstrate that the Seisco water heaters are "impaired property" because they have not demonstrated that the property could be restored by the repair, replacement, adjustment or removal of UPG's water chamber or through UPG's fulfilling the terms of its contract or agreement. In addition, the Seisco water heaters were physically injured. Accordingly, Exclusion E does not exclude coverage.

### Exclusions F and G

Exclusions F and G exclude coverage, respectively, to "'property damage'" to 'your product' arising out of it, or any part of it" and "'property damage' to 'your work' arising out of it or any part of it and included in the 'product-completed operations hazard.'" These exclusions exclude

coverage to UPG's work and product – damage to the water chambers themselves. UPG does not seek coverage based on damage to its product - the water chambers themselves. Accordingly, Exclusions F and G do not exclude coverage.

### Exclusion H

Exclusion H of the Ohio Casualty policy excludes coverage for the cost of recalling or replacing UPG's faulty chambers or the costs of any recall by Microtherm. Neither has occurred; accordingly, Exclusion H does not exclude coverage.

### Ohio Casualty's Miscellaneous Arguments

Ohio Casualty argues that it is not obligated to pay anything to Microtherm because Microtherm has released UPG. Ohio Casualty's argument has been rejected by the Illinois courts. *See Guillen v. Potomac Ins. Co. of Ill.*, 203 Ill. 2d 141, 160-61 (2003). Ohio Casualty also argues that all of UPG's claims should be dismissed because UPG has assigned all of its rights to Microtherm. While UPG does not dispute that an assignment was made, Ohio Casualty raised the issue of the validity of the assignment in its pre-trial submission to the Court but offered no evidence as to this theory at trial. Furthermore, UPG contributed $1 million of its own funds toward the settlement between UPG and Microtherm. As discussed above, the damages awarded in the Microtherm lawsuit are covered under the Ohio Casualty policy; therefore, the sums UPG contributed should have been paid by Ohio Casualty. Accordingly, UPG has standing to pursue the $1 million it contributed toward the settlement.

## CONCLUSION

Ohio Casualty's Motion *in Limine* to Exclude Additional Evidence or Testimony is denied.

Ohio Casualty's Motion for Leave to Amend is granted. Judgment is entered in favor of Microtherm

and UPG. The Ohio Casualty insurance policy does provide coverage for the damages arising under

the underlying Microtherm lawsuit, including those awarded in the Final Judgment.

Dated: September 11, 2006

JOHN W. DARRAH
United States District Court Judge