IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WASAU UNDERWRITERS INSURANCE COMPANY, *et al.*, | ) ) ) | |
| *Plaintiff*, | ) ) | 04 CV 6543 |
| v. | ) ) | |
| UNITED PLASTICS GROUP, INC., | ) ) ) ) ) | Honorable David H. Coar |
| *Defendant*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before this Court is a Motion for Summary Judgment filed by Intervenor Ohio Casualty Company ("Ohio Casualty"), an excess liability insurer incorporated in Ohio, against Defendants Microtherm, Inc. ("Microtherm"), a Texas-based water heater manufacturer, and United Plastics Group, Inc. ("UPG"), a component manufacturer operating principally in Illinois. Ohio Casualty seeks summary judgment in its favor, claiming that its excess insurance policy does not cover Microtherm's $26.5 million judgment against UPG, as assessed by a jury in an underlying tort case. For the reasons stated below, Ohio Casualty's Motion for Summary Judgment is DENIED.

1

# FACTS[1]

Microtherm is a manufacturer of "Seisco" water heaters. In 2001, the company sold 3,900 water heaters containing plastic chambers supplied by UPG. UPG made the chambers out of Zytel, a Dupont plastic with a recommended temperature range for molding. UPG used a significantly lower melt temperature than Dupont recommended, resulting in defective chambers that caused the failure of hundreds of Microtherm's water heaters.

By the time the underlying suit came to trial in Texas state court in 2004, about 600 UPG chambers in Microtherm's heaters had ruptured. The majority of these failures occurred after Ohio Casualty's policy had expired in September 2002; only 65 to 75 heaters stopped working while the policy was still in effect. The ruptures rendered the water heaters inoperative, usually – but not always – by shorting their circuit boards. On occasion, the ruptures caused the heaters to leak, damaging carpets or other personal property. Approximately 52 to 60 of the 65 to 75 failures occurring during Ohio Casualty's policy period resulted in damage to circuit boards or other property. The ensuing frustration with Microtherm's products led to a steep decline in business for the company.

Microtherm filed suit in Texas state court against UPG, alongside other component manufacturers, complaining of faulty components. A jury found in favor of Microtherm, issuing damages findings on a defendant-by-defendant divisible basis. Damages against UPG amounted to $26.5 million: $1.1 million for the cost of repairing or replacing the water heaters, $330,000 for punitive damages, and the remainder for lost profits resulting from customer dissatisfaction with Microtherm. The jury also issued a special verdict finding that UPG had knowingly

---

[1] The Court states the facts as recited in the Seventh Circuit opinion remanding this case. *See Wasau Underwriters Ins. v. United Plastics Group*, 512 F.3d 953 (7th. Cir. 2008).

misrepresented the quality of its product by failing to disclose that it had disregarded Dupont's recommendations.

Wasau Insurance Company ("Wasau"), UPG's primary liability insurer, brought this suit in federal district court, seeking a declaration that the tort judgment was not covered by Wasau's insurance policy. *See Wasau Underwriters Ins. Co. v. United Plastics Group*, No. 04 C 6543, 2006 WL 2633248 (N.D. Ill. Sept. 11, 2006). Ohio Casualty, UPG's excess liability insurer, intervened in Wasau's suit, seeking a similar declaration. Wasau ultimately settled with UPG, leaving Ohio Casualty to pursue the case alone.

The district judge, relying primarily on the record of the Texas case, ruled in a bench trial that Ohio Casualty was liable on its excess policy for the damages assessed by the Texas jury. *Id.* at *12.

On appeal, the Seventh Circuit reversed and remanded. *See Wasau Underwriters Ins. v. United Plastics Group*, 512 F.3d 953 (7th. Cir. 2008) ("*Wasau II*"). It held that the extent of Ohio Casualty's coverage turned on key issues that were not tried by the district court. Specifically, the district court should have removed from coverage those portions of the award arising from (1) UPG chamber failures that did not damage Microtherm circuit boards or other surrounding property, or (2) harm that was either expected or intended by UPG, as these costs did not fall under Ohio Casualty's insurance policy. *See id.* at 956, 958-61. Although Ohio Casualty's policy covered damages arising from business losses suffered by Microtherm, the Seventh Circuit held that the district court should have determined how much of the judgment was attributable to lost profits arising from failures occurring within Ohio Casualty's policy period, as opposed to after its expiration. *See id.* at 958-59. The Seventh Circuit disapproved of the district judge's assumption that these key factors had been resolved by the Texas jury. *See*

3

*id.* at 959. As the Circuit Court pointed out, these issues are specifically germane to insurance coverage, and thus not relevant to, nor presented at, the Texas trial. *See id*.

Substantive issues in this diversity suit are governed by Illinois law.

**LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc*., 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co*., 528 F.3d 508, 512 (7th Cir. 2008).

# ANALYSIS

**I. Covered Property Damage and Business Losses within the Policy Period**

Ohio Casualty asserts that, due to the way Microtherm and UPG tried the case in state court, it is impossible to decipher to how much of the award the Texas jury attributed to chamber failures occurring outside of Ohio Casualty's policy period, or to failures that did not damage circuit boards or other property. The jury provided no explanation as to how their judgment was allocated, nor did Microtherm or UPG present evidence at trial from which a jury could have drawn conclusions about causation, harm, and timing at the level of specificity required to assess insurance coverage. Ohio Casualty summarizes its points as follows:

> This Court is being asked to determine what portion, if any, of the judgment in the underlying case as against UPG was for damages because of covered property damage during Ohio Casualty's policy period. If Microtherm had tried the underlying case by showing specific items of damage tied to particular component failures, or if UPG had requested special interrogatories on these subjects, this Court perhaps would have some possibility of allocating the damages evidence according to covered and uncovered amounts. . . . Instead, this Court is confronted by Microtherm and UPG with nebulous evidence in the underlying case and an inexplicable verdict.

That Ohio Casualty exhausted significant effort in elaborating this argument, so as to justify exceeding the Court's page limit, is puzzling. This Court was specifically tasked by the Seventh Circuit to try issues that were not the subject of the underlying tort case. The Circuit Court was well aware of the fact that, given the evidence presented at trial, the jury did not, and indeed could not, determine how much of Microtherm's business losses were due to ruptured chambers that damaged other property, or to business losses incurred by Microtherm within the policy period. *Wasau II*, 512 F.3d at 959. The Seventh Circuit remanded precisely because the original district court presumed too much from the record of the Texas case, even when faced

5

with issues beyond the purview of that jury.

The sentiment is not a novel one. While an underlying trial and verdict may certainly bear upon an insurer's duty to indemnify, *see International Ins. Co. v. Rollprint Packaging Prod., Inc.*, 312 Ill. App.3d 998, 1013 (2000), issues exclusively relevant to coverage, as opposed to liability, are typically not litigated in an underlying case. *See Pekin Ins. Co. v. Pulte Home Corp.*, 344 Ill.App.3d 64, 71 (2003*); Schal Bovis, Inc. v. Casualty Insurance Co.*, 315 Ill.App.3d 353, 368 (2000). As a result, courts may consider additional evidence when deciding later indemnification actions. *See id*.

What matters to the disposition of this motion is the evidence before this Court, now. Exposing the inadequacies of the record in the Texas case does nothing to resolve present issues of material fact as to whether any part of Microtherm's judgment arises from covered property damage or business losses. In any event, UPG and Microtherm have submitted enough evidence to support a finding of at least some amount of coverable property damage and business losses occurring within the policy period. (Seitz. Aff. ¶ 10-12; Uecker Dep. 37-38; Def. Ex. 12 at 32-33.) Summary judgment in Ohio Casualty's favor is therefore inappropriate on these grounds.

**II. Expected or Intended Harm**

Ohio Casualty's policy covers "all . . . 'property damage' from an 'occurrence' . . . arising out of 'your product.' " An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Seventh Circuit interpreted the term "accident" as "the exclusion for harms that are 'expected or intended from the standpoint of the insured.'" *Wasau II*, 512 F.3d at 960. The Circuit Court goes on to distinguish between an intentional act and an intentional harm. In essence, although UPG

6

"knowingly" misrepresented the use of a lower melt temperature, as established by the Texas jury's special verdict, it may nevertheless have done so without expecting any harm, or at least as much harm as actually occurred. *Id.* Because the Texas jury did not address the question of whether UPG intended or expected harm of the magnitude that befell Microtherm, it remains a question for the trier of fact in the instant case. *Id.* at 961.

Ohio Casualty argues that litigation of this issue is collaterally estopped by *National Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 649 F.Supp.2d 613 (S.D. Tex 2009) ("*Puget III*"). Puget, the component manufacturer that preceded UPG as a seller of defective Zytel water chambers to Microtherm, had also used lower melt temperatures responsible for subsequent chamber and heater failures. Microtherm sued Puget alongside UPG in Texas state court. Puget's insurer, National Union Fire Insurance, brought the above case in the Southern District of Texas, seeking a declaration that it owed no duty to indemnify Puget for the tort judgment. Microtherm litigated the indemnification action as a defendant-intervenor.[2]

Similar to the instant case, the *Puget III* court had been ordered by the Fifth Circuit to try whether the harm arising from Puget's deviance from normal processing procedures and temperature ranges qualified as an "accident" for purposes of insurance coverage. *See National Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 532 F.3d 398, 402 (5th Cir. 2008) (*Puget II*). The Fifth Circuit noted that "[i]n Texas, deliberate acts may constitute an accident unless: (1) the resulting damage was "highly probable" because it was "the natural and expected result of the insured's actions," (2) "the insured intended the injury," or (3) the insured's acts constitute an intentional tort, in which case, the insured is presumed to have intended the injury. In sum, Appellees cannot recover under the Policy if: (1) the injury to Microtherm was highly

---

[2] Ohio Casualty claims that UPG was represented by Microtherm in *Puget* under the doctrine of virtual representation. *See Monfils v.* Taylor, 165 F.3d 511, 521 (7th Cir. 1998). Defendants have not denied this.

7

probable, (2) Puget intended or expected the injury inflicted on Microtherm, or (3) Puget committed an intentional tort." *Id.* (internal citations omitted).

On remand, the district court found that Puget did not intend or expect the injuries Microtherm suffered because Puget's employees believed that any problems caused by their processing modifications could be remedied by higher mold temperatures. *Puget III* at 644, 656 n. 81. However, the court ultimately found in favor of the insurer, because the "the resulting damage was a highly probable result of Puget's deliberate actions," in satisfaction of the first prong of the Fifth Circuit's analysis. *Id.* at 656 n. 81. According to the court, a reasonable molder would have known that melt temperatures 100ºF below the ideal, combined with low injection/packing pressure and mold tool modifications that impaired cooling, would have resulted in chamber leaks onto surrounding surfaces, including the heater and homeowner property. *Id.* at 645. In the court's estimation, a reasonable molder would also know that and that no amount of increase in the mold temperature could compensate for low processing temperatures. *Id.* at 646.

Four elements must be met to invoke collateral estoppel: 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905-06 (7th Cir. 1990) (quotations omitted). Defendants dispute the first factor.

At issue, then, is whether the legal and factual questions analyzed by the *Puget III* court are identical to the questions facing this Court. The *Puget III* court decided that the harm incurred by Microtherm was not an "accident" under Texas law because it was highly probable

that Puget's substandard processing parameters and molding conditions would result in leaks onto surrounding property. However, a number of distinguishable variables in *Puget III* undermine Ohio Casualty's invocation of collateral estoppel.

The most noticeable variation lies in the rules of law applied in *Puget III* and the instant case. Where the facts or legal rules governing a specific case or issue differ, collateral estoppel does not apply. *See* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4425 (2d ed. 2002) ("Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules.").

When an issue has been tried in a prior case but under another state's law, collateral estoppel does not bar relitigation of that issue in the Seventh Circuit. *See Boomer v. AT & T Corp.*, 309 F.3d 404, 422 n. 10 (7th Cir.2002) (holding that collateral estoppel did not bar a party from defending, under Illinois law, validity of an arbitration clause, despite prior litigation in which clause was deemed unenforceable under California law). Other circuits have ruled likewise. *See, e.g.*, *Cincinnati Ins. Co. v. Beazer Homes Investments, LLC,* 2010 WL 374735, at *3-5 (6th Cir. 2010) (holding that collateral estoppel did not bar litigation of whether 'property damage' was caused by an 'occurrence' under Indiana law in an insurance coverage action, where South Carolina law was applied in prior suit); *Sw. Pet Prods., Inc. v. Koch Indus., Inc.,* 32 F. App'x 213, 215 (9th Cir. 2002) (prior suit decided under California law did not preclude litigation of the same issue under Arizona law, because the issues were not "identical" due to differing rules of law); *Guild Trust v. Union Pac. Land Res. Corp.*, 682 F.2d 208, 211 (10th Cir.1982) (denying the application of collateral estoppel, in part, because the law applied in the prior case was Colorado property law as opposed to Wyoming property law); *see also 475342 Alberta, Ltd. v. Starfire*, No. 95-2083-GTV, 1996 WL 370221, at *3 (D. Kan. June 19, 1996)

(denying collateral estoppel where a prior court had applied Oklahoma and California contract law, but Kansas law applied in the subsequent case, stating that "[b]ecause the law of different states applies, this court is not presented with an identical issue").

To overcome this hurdle, Ohio Casualty argues that Illinois and Texas courts interpret "intended or expected" in insurance actions similarly, citing the use of an "objective forseeability standard" by Illinois courts that resembles the "highly probable" standard followed by the *Puget III* court. Yet, even if the standards were comparable, Illinois case law and Texas case law have hardly developed along identical paths. *See Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971) (per curiam) (Collateral estoppel did not apply in a case where the issue was whether financial records were inadequate under federal law, when a prior case had already decided the issue under California law. Even though "these inquiries are likely very similar, we have no indication that California corporation law precisely traces the federal law of bankruptcy on this point."). Similarities aside, *Puget* never addressed the precise question of whether UPG "expected or intended" harm to Microtherm under Illinois law. As such, identity of issues is lacking. *See Quixtar Inc. v. Brady*, Nos. 08-14346, 08-14347, 2008 WL 5386774 (E.D. Mich. Dec. 17, 2008) (despite party's argument that Michigan law is "completely in accord with Texas law on the subject" and district court's admission that the two states' laws may well coincide, prior Fifth Circuit opinion had no preclusive effect because the "precise issue" of the enforceability of arbitration provisions under Michigan law was not litigated).

In any event, the holdings in *Puget III* were premised on facts distinguishable from those now before this Court. The *Puget III* court did not base its finding of fault solely on the use of low melt temperatures, but also considered Puget's unorthodox mold tool modifications and low injection/packing pressure. While UPG used similar melt temperatures as Puget, there is no

10

indication that UPG varied from standard operating procedures in other areas in exactly the same ways as Puget did.

Most notably, whereas Puget moved its chamber mold tool to a 600-ton machine from the agreed-upon 500-ton machine, UPG moved its tool from a 500 to a 300-ton machine. (Def. Statement of Facts ("SOF") ¶ 13.) The parties do not dispute that variations in machine size, part geometry, and end-use application can permit slight variations to Dupont's recommended melt temperatures. (Def. SOF ¶ 4.) In light of the adjustments UPG approved to accommodate a different machine size than that utilized by Puget, it remains to be seen how the variations UPG implemented may factor into an "expected or intended" analysis.

Whether Puget's and UPG's misconduct produced similar failure rates is also unclear. When remanding the case, the Seventh Circuit stated:

> What cannot be determined from the jury's verdict is how great a risk UPG thought it was taking. Surely it did not expect 15 percent of the heaters it sold not to work. What did it expect? . . . [An] insured may not 'expect or intend' the damage when the actual result is an injury wholly different in kind from the type he anticipated would occur; and the magnitude of the resulting harm is one factor that can be considered in that assessment. Suppose UPG thought that 0.1 percent of the heaters would fail; instead 15 percent did. Is the difference in magnitude enough to show that the harm to the customers that occurred was "expected"? That is a jury question, but not a jury question that the Texas jury answered. It is another question for the trier of fact in this case (a judge, not a jury, since the parties agreed to a bench trial) to determine." *Wasau II*, 512 F.3d at 959-61 (internal quotations and citations omitted).

*Puget III* implies that the rate at which Puget chambers ruptured was a highly probable result of Puget's actions. Yet, nowhere does the opinion mention the percentage of Puget chambers that ultimately failed, and whether that percentage was at all comparable to the percentage of failed UPG chambers. This Court thus cannot rely on *Puget* for answers to the questions before it. Because *Puget* was decided on laws and facts distinct from those now under

11

consideration, the issues are not the same for the purposes of collateral estoppel.

## CONCLUSION

For the foregoing reasons, Ohio Casualty's Motion for Summary Judgment is DENIED.

Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **February 10, 2010**